Endpoints News Media Company, LLC
vs.
Michael Peck

ELECTRONICALLY FILED
2023 Sep 22 PM 1:23
CLERK OF THE DOUGLAS COUNTY DISTRICT COURT
CASE NUMBER: DG-2023-CV-000327
PII COMPLIANT

**SUMMONS**

To the above-named Defendant/Respondent:

**Michael Peck
97 Allison Road
Katonah, NY  10536**

You are hereby notified that an action has been commenced against you in this court. You are required to file your answer or motion under K.S.A. 60-212, and amendments thereto, to the petition with the court and to serve a copy upon:

Bernard Rhodes
2345 Grand Blvd., Ste. 2200
Kansas City, MO 64108

within 21 days after service of summons on you.

Clerk of the District Court
Electronically signed on 09/25/2023 11:54:54 AM

**Documents to be served with the Summons:**

ELECTRONICALLY FILED
2023 Sep 22 PM 1:23
CLERK OF THE DOUGLAS COUNTY DISTRICT COURT
CASE NUMBER: DG-2023-CV-000327
PII COMPLIANT

## IN THE DISTRICT COURT OF DOUGLAS COUNTY, KANSAS
## CIVIL COURT DEPARTMENT

| | |
|---|---|
| ENDPOINTS NEWS MEDIA COMPANY, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL PECK, ) <br> 97 Allison Road ) <br> Katonah, NY  10536 ) <br> ) <br> Defendant. ) | Case No. _____ <br> Chapter 60 |

### Petition for Declaratory Judgment and Damages

Plaintiff Endpoints News Media Company, LLC, for its causes of action against Defendant Michael Peck, states as follows:

### The Parties

1. Plaintiff Endpoints News Media Company, LLC ("Endpoints News"), is a Delaware limited liability company authorized to conduct business in Kansas.

2. Endpoints News is the successor in interest to Endpoints Co., a Kansas corporation, by way of a conversion pursuant to KSA 17-78-7404 through 17-78-406, effective October 14, 2022.

3. Defendant Michael Peck is a former employee of Endpoints News, whose employment was terminated effective March 23, 2022, for cause due to conduct unbecoming of an employee.

### The Transition Agreement and General Release

4. At the time Peck's employment with Endpoints News was terminated for cause, Peck and Endpoints News signed a "Transition Agreement and General Release," a copy of which is attached as Exhibit A.

62484462v1

5.  The Transition Agreement and General Release contains the following defined terms:

> Peck is referred to as "Employee;"
>
> Endpoints News is referred to as the "Company;"
>
> The Transition Agreement and General Release is referred to as "the Agreement;"
>
> Peck's last day of employment is referred to as the "Separation Date;"
>
> The consideration paid to Peck pursuant to the Agreement is referred to as "Transition Pay;" and
>
> The parties Peck released are referred to as the "Released Parties."

**Peck's Promises Under the Transition Agreement and General Release**

6.  Paragraph 4 of the Transition Agreement and General Release provides as follows:

> Employee understands and agrees that following the Separation Date, *Employee shall not be eligible for nor receive any* compensation, benefits or *payments from the Company* ....

(Emphasis added)

7.  Paragraph 4 of the Transition Agreement and General Release further provides as follows:

> *Employee agrees he is owed no* further wages, overtime pay, salary, commissions, expenses, bonuses, sales incentives, benefit time, *equity*, or any other compensation of any kind.

(Emphasis added).

8.  Paragraph 5 of the Transition Agreement and General Release provides as follows:

> *Employee*, on Employee's own behalf and on behalf of Employee's heirs, executors, administrators, personal representatives, successor, assigned, agents, servants, and attorneys, *releases and forever discharges the Company* together with the Company's affiliates, successors, and assigns, as well as each of their respective Boards of Directors, agents, servants, representatives, shareholders,

members, directors, officers, insurers, attorneys, and employees (all collectively, the "Released Parties") *from any and all claims, causes of action, liabilities, covenants, agreements, obligations, damages and/or demands of every nature, character, and description ... which Employee had, has or may have ... whether known or unknown ....*

(Emphasis added).

9. The conclusion of the Transition Agreement and General Release provides as follows:

EMPLOYEE UNDERSTANDS THAT, BY SIGNING THIS TRANSITION AGREEMENT, *EMPLOYEE IS AGREEING TO WAIVE THE RELEASED CLAIMS HEREIN THAT EMPLOYEE HAS OR MIGHT HAVE AGAINST THE COMPANY.*

(Emphasis added).

### Consideration for Peck's Promises

10. Paragraph 3 of the Transition Agreement and General Release provides as follows:

*In consideration for Employee's timely execution and return of this Transition Agreement and continuing compliance with the promises made herein, the Company will: a) pay Employee the gross amount of Four Hundred Fifty Six Thousand and no/100* ($456,000.00) less applicable withholdings and taxes ("Transition Pay") ....

(Emphasis added).

### The Parties Agree to Kansas as the Choice of Law and Forum

11. Paragraph 18 of the Transition Agreement and General Release provides as follows:

This Agreement shall at all times and in all respects be governed by and *construed in accordance with the law of the State of Kansas.* The parties agree that any dispute involving the terms of this Agreement *will be brought in the appropriate Federal or State Court in Douglas County, Kansas* and the parties specifically consent to jurisdiction before such courts for an action arising ou[t] of or relating to this Agreement.

(Emphasis added).

### Peck's Demands for More Money

12. Despite the explicit promises Peck made in the Transition Agreement and General Release, on April 5, 2023, Peck demanded Endpoints News pay him for his claim to a so-called "1.5% equity share" in Endpoints News.

13. On April 6, 2023, counsel for Endpoints News wrote Peck and advised Peck (1) he never had an equity share in the company, and (2) he waived and released any claim to an equity share in the company when he executed the Transition Agreement and General Release in exchange for a payment of $456,000.

14. Despite being formally notified he had waived and released any claim to an equity share in the company when he executed the Transition Agreement and General Release, on May 12, 2023, Peck had a New York lawyer—who is not admitted in the State of Kansas—write and demand Endpoints News pay Peck for his claim to a so-called "1.5% equity share" in Endpoints News.

15. On May 22, 2023, counsel for Endpoints News wrote Peck's New York lawyer and advised him his client waived and released any claim to an equity share in the company when he executed the Transition Agreement and General Release.

16. In that same letter, counsel for Endpoints News warned Peck's New York lawyer that if he and his client pursued Peck's released claim, Endpoints News would seek repayment of the $456,000 "Transition Pay" due to Peck's breach of the Transition Agreement and General Release.

17. Despite being previously notified of Endpoints News' right to seek repayment of the $456,000 "Transition Payment," on September 12, 2023, the same New York lawyer wrote

4

62484462v1

and demanded Endpoints News pay Peck for his claim to a so-called "1.5% equity share" in Endpoints News.

## Count I – Declaratory Judgment

18. Plaintiff incorporates by reference the allegations of Paragraphs 1-17.

19. Endpoints News seeks a declaration that Peck waived and released any claim to a so-called "1.5% equity share" in Endpoints News when he executed the Transition Agreement and General Release and received the $456,000 "Transition Payment."

20. Despite being repeatedly reminded by Endpoints News that he waived and released his claim, Peck and his New York lawyer continue to demand that Endpoints News pay Peck for a released claim.

21. Accordingly, a genuine controversy exists between Endpoints News and Peck as to whether Peck waived and released any claim to a so-called "1.5% equity share" in Endpoints News when he executed the Transition Agreement and General Release and received the $456,000 "Transition Payment."

WHEREFORE, Plaintiff Endpoints News Media Company, LLC, requests the Court enter its judgment declaring that Defendant Michael Peck waived and released any claim to a so-called "1.5% equity share" in Endpoints News when he executed the Transition Agreement and General Release and received the $456,000 "Transition Payment," award plaintiff its costs, and provide such other and further relief as the Court deems just.

## Count II – Breach of Contract

22. Plaintiff incorporates by reference the allegations of Paragraphs 1-21.

23. Pursuant to Paragraph 3 of the Transition Agreement and General Release, Peck was paid $456,000 in consideration for his execution of the Agreement and his "continuing

compliance with the promises made herein."

24. Among "the promises he made herein" were that (a) he "agrees that following the Separation Date, *Employee shall not be eligible for nor receive any* compensation, benefits or *payments from the Company*," (b) he agrees "*he is owed no* further wages, overtime pay, salary, commissions, expenses, bonuses, sales incentives, benefit time [or] *equity*," and (c) he "*releases and forever discharges the Company … from any and all claims, causes of action, liabilities, covenants, agreements, obligations, damages and/or demands of every nature, character, and description … which Employee had, has or may have … whether known or unknown ….*" (Emphasis added).

25. Peck has breached those promises by making repeated demands that Endpoints News pay Peck for a claim he has released.

26. Endpoints has been damaged by Peck's breach in the amount of $456,000 plus the attorney's fees it incurred in responding to his repeated demands that Endpoints News pay Peck for a claim he has released.

WHEREFORE, Plaintiff Endpoints News Media Company, LLC, requests the Court enter Judgment ordering Defendant Michael Peck to pay damages of $456,000, along with Plaintiff's attorney's fees and costs in an amount to be proven at trial, together with such other and further relief as the Court deems just.

### Count III – Conversion

27. Plaintiff incorporates by reference the allegations of Paragraphs 1-26.

28. When Peck executed the Transition Agreement and General Release, he explicitly acknowledged that was being paid $456,000 in consideration for his execution of the Agreement and his "continuing compliance with the promises made herein."

29. Among "the promises he made herein" were that (a) he "agrees that following the Separation Date, *Employee shall not be eligible for nor receive any* compensation, benefits or payments *from the Company,*" (b) he agrees "*he is owed no* further wages, overtime pay, salary, commissions, expenses, bonuses, sales incentives, benefit time [or] *equity,*" and (c) he "*releases and forever discharges the Company ... from any and all claims, causes of action, liabilities, covenants, agreements, obligations, damages and/or demands of every nature, character, and description... which Employee had, has or may have ... whether known or unknown ....*" (Emphasis added).

30. As a result of Peck's wrongful actions, Peck converted for his own benefit the $456,000 "Transition Payment" to the exclusion of Endpoints News' right of ownership in the "Transition Payment."

WHEREFORE, Plaintiff Endpoints News Media Company, LLC, requests the Court enter Judgment ordering Defendant Michael Peck to pay damages of $456,000, together with such other and further relief as the Court deems just.

## Count IV – Unjust Enrichment

31. Plaintiff incorporates by reference the allegations of Paragraphs 1-30.

32. When Peck executed the Transition Agreement and General Release, he explicitly acknowledged that was being paid $456,000 in consideration for his execution of the Agreement and his "continuing compliance with the promises made herein."

33. Among "the promises he made herein" were that (a) he "agrees that following the Separation Date, *Employee shall not be eligible for nor receive any* compensation, benefits or payments *from the Company,*" (b) he agrees "*he is owed no* further wages, overtime pay, salary, commissions, expenses, bonuses, sales incentives, benefit time [or] *equity,*" and (c) he "*releases*

*and forever discharges the Company … from any and all claims, causes of action, liabilities, covenants, agreements, obligations, damages and/or demands of every nature, character, and description… which Employee had, has or may have … whether known or unknown ….*" (Emphasis added).

34. It is against fairness, equity and good conscience to allow Peck to keep the $456,000 "Transition Pay" while simultaneously claiming he is not bound by the promises he made in the Transition Agreement and Release.

WHEREFORE, Plaintiff Endpoints News Media Company, LLC, requests the Court enter Judgment ordering Defendant Michael Peck to pay damages of $456,000, together with such other and further relief as the Court deems just.

Respectfully submitted,

LATHROP GPM LLC

By: */s/Bernard J. Rhodes*
Bernard J. Rhodes    KS #15716
Emma Halling         KS #27924
2345 Grand Blvd., Suite 2400
Kansas City, Missouri 64108
(816) 292-2000 – Telephone
(816) 292-2001 - Facsimile
bernie.rhodes@lathropgpm.com
emma.halling@lathropgpm.com

Tammy Somogye       KS #18210
7300 West 110th Street – Ste. 150
Overland Park, KS 66210
(913) 451-5100 – Telephone
(913) 451-0875 – Facsimile
tammy.somogye@lathropgpm.com

Attorneys for Plaintiff Endpoints News Media, LLC

## TRANSITION AGREEMENT AND GENERAL RELEASE

Endpoints News (the "Company") and Mike Peck ("Employee") hereby enter into the following Transition Agreement and General Release ("the Agreement") based on the terms and conditions set forth below.

1. **Acknowledgment of Receipt.** Employee acknowledges receipt of the Agreement on March 25, 2022.

2. **Separation of Employment.** Employee's employment with the Company ended effective March 23, 2022 (the "Separation Date"). Employee will perform no further work of any kind for the Company nor hold himself out as a representative of the Company following the Separation Date.

3. **Consideration.** In consideration for Employee's timely execution and return of this Transition Agreement and continuing compliance with the promises made herein, the Company will: a) pay Employee the gross amount of Four Hundred Fifty Six Thousand and no/100 ($456,000.00) less applicable withholdings and taxes ("Transition Pay"), and b) reimburse Employee for COBRA premiums through the earlier of: i) the date Employee secures alternative group health insurance coverage; or ii) December 2022. Transition Pay will be paid in equal installments of Nineteen Thousand and no/100 ($19,000.00) less applicable withholdings and taxes with the initial installment due on the first regularly scheduled payroll date that is at least eight (8) days after Employee signs the Agreement and the remaining installments to be made on bi-weekly regularly scheduled payroll dates until the full amount has been paid provided no timely revocation is received. To receive reimbursement for COBRA premiums, Employee must timely elect COBRA continuation coverage and must submit proof of COBRA premium payment to the Company within ten (10) days of each such payment.

4. **No Other Compensation.** Employee understands and agrees that following the Separation Date, Employee shall not be eligible for nor receive any compensation, benefits or payments from the Company or any other entity or person released herein except as specifically set forth in this Transition Agreement, unless required by applicable State or Federal law. Employee agrees he is owed no further wages, overtime pay, salary, commissions, expenses, bonuses, sales incentives, benefit time, equity, or any other compensation of any kind. Employee certifies that by signing this Agreement he has properly submitted all reimbursable business expenses and has been reimbursed for same.

5. **Release.** Employee, on Employee's own behalf and on behalf of Employee's heirs, executors, administrators, personal representatives, successors, assigns, agents, servants, and attorneys, releases and forever discharges the Company together with the Company's affiliates, successors, and assigns, as well as each of their respective Boards of Directors, agents, servants, representatives, shareholders, members, directors, officers, insurers, attorneys, and employees (all collectively, the "Released Parties") from any and all claims, causes of action, liabilities, covenants, agreements, obligations, damages and/or demands of every nature,

1

**EXHIBIT A**

character, and description, in federal or state court without limitation in law, equity, or otherwise, which Employee had, has, or may have (except to the extent noted herein) against any of the Released Parties, whether known or unknown including, but not limited to, any claim under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Americans with Disability Act, the Family and Medical Leave Act, the Genetic Information Nondiscrimination Act, the Employment Retirement Income Security Act (except for any claim for vested benefits under the terms of any employee benefit plan), or any other federal or state statute prohibiting employment discrimination or harassment and any claim for wrongful discharge, breach of contract, retaliation, or any other right or claim under statutory or common law arising from or relating to Employee's employment with the Company and/or the separation of Employee's employment therefrom (collectively, the "Released Claims"). Notwithstanding any other provision of this Agreement to the contrary, Employee does not waive any rights or claims that may arise after the date the Agreement is executed. Excluded from this Agreement are claims that cannot be waived by law. For example, Employee does not waive any rights or claims related to the enforcement of this Transition Agreement, for workers' compensation benefits, or for unemployment compensation. Further, nothing in this Agreement shall be construed to 1) affect the rights and responsibilities of the Equal Employment Opportunity Commission ("Commission") to enforce the statutes with which the Commission is charged with enforcement responsibility; or 2) to interfere with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the Commission or any other federal or state governmental agency. Employee agrees, however, that by signing this Agreement he expressly waives his right, if any, to recover in a suit brought by the Commission or any other federal or state governmental agency on his behalf.

6.  Non-disparagement. Employee agrees he will not cause, facilitate or endorse, any disparagement, trade libel, defamation or knowingly false information about the Company, its Board of Directors and any of the Released Parties as defined herein (whether directly or indirectly, by way of innuendo, reference or suggestion, spoken, in writing or electronically and regardless of means or method including by way of social media). The Company's officers with knowledge of this Transition Agreement will not cause, facilitate or endorse, any disparagement, trade libel, defamation or knowingly false information about Employee (whether directly or indirectly, by way of innuendo, reference or suggestion, spoken, in writing or electronically and regardless of means or method including by way of social media) unless required by applicable law or business processes. The Parties agree the obligations in this Section 6 do not apply to discussions with their respective attorneys and disclosures in connection with legal and/or governmental administrative proceedings or as may be otherwise required by law. Notwithstanding the foregoing, the Parties agree that nothing contained in this provision shall prevent or prohibit the Parties from providing truthful, complete testimony before any legal or administrative proceeding or in communications with their respective legal counsel.

7.  Legal Disclosure. By signing this Agreement, Employee warrants and represents that he has reported to Chip Staton, Chief Financial Officer of the Company, in writing all pending and/or threatened legal proceedings of any kind involving or relating to the Company

that Employee became aware of during his tenure with the Company. Employee further warrants and represents that he has reported to Chip Staton in writing any alleged violations of law by the Company that he became aware of during his tenure with the Company. Should Employee have no information to report under this Section, he will so advise Chip Staton in writing prior to or, at the latest, on the date he signs this Agreement. Employee understands that complying with the terms of this Section is required as a material term of this Agreement.

8. Cooperation. Employee agrees he will cooperate with the Company and its counsel at all times in any internal or external claims, charges, audits, investigations, and/or lawsuits involving Employee of which Employee may have knowledge or in which Employee may be a witness. Such cooperation includes meeting with the Company's representatives and counsel to disclose such facts as Employee may know; preparing with the Company's counsel for any deposition, trial, hearing, or other proceeding; attending any deposition, trial, hearing or other proceeding to provide truthful testimony; and providing other assistance to the Company and its counsel in the defense or prosecution of litigation as may, in the sole judgment of the Company's counsel, be necessary. The Company agrees to reimburse Employee for reasonable and necessary out-of-pocket expenses incurred by him in the course of complying with this obligation and which are pre-authorized by the Company. Nothing in this Section should be construed in any way as prohibiting or discouraging Employee from testifying truthfully and completely, under oath as part of, or in connection with, any such proceeding.

9. Return of Company Property. By Employee's signature below, he certifies he has returned all Company property to the Company in good working order and that he has not retained any Company property, including documents in paper or electronic format.

10. Confidential Company Information. Employee acknowledges that during the term of Employee's employment, Employee had access to and became familiar with Confidential Information and Trade Secrets regarding the affairs and business of the Company. By signing this Agreement, Employee represents that Employee has kept all such Confidential Information and Trade Secrets confidential. Employee understands and agrees that as a condition of receiving the benefits in this Agreement, he must continue to safeguard all Confidential Information and Trade Secrets and he must not disclose any Confidential Information to any unauthorized persons or entities. Employee agrees to promptly deliver to the Company the originals and all copies of any and all Confidential Information and Trade Secrets in Employee's possession, custody or control, no later than five (5) days after the Separation Date. Employee is hereby notified in accordance with the Defend Trade Secrets Act of 2016 that Employee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. Employee is further notified that if Employee files a lawsuit for retaliation by an employer for reporting a suspected violation of law, Employee may disclose the employer's trade secrets to Employee's attorney and use the trade secret information in the court proceeding if Employee: (a) files any

document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order. Employee understands that he is not authorized to waive the attorney-client privilege and that he must continue to safeguard and protect the confidential nature of all attorney-client privileged information in any form.

11. <u>Confidentiality of this Transition Agreement</u>. Employee agrees not to disclose any information to any third party regarding the existence or substance of this Transition Agreement, except as required by law, court order or court direction. Notwithstanding the foregoing, Employee may disclose such information in the scope of pursuing a charge or participating in a governmental agency investigation of claims and to Employee's attorney, financial advisor and/or family member, provided Employee has informed such person(s) of this confidentiality requirement.

12. <u>Unemployment Benefits</u>. Employee is welcome to apply for unemployment compensation through the appropriate State procedures. The Company will respond truthfully to all questions from the State unemployment authorities. The Company makes no representations about whether Employee will qualify for unemployment compensation as that is a matter for the unemployment authorities and applicable State law.

13. <u>Restrictive Covenants</u>. Employee agrees that for a period of twelve (12) months following the Separation Date, Employee will not directly or indirectly encourage, solicit, induce, or attempt to encourage solicit, or induce any vendor or advertiser to terminate its business relationship with the Company or attempt to interfere with the Company's business relationship with any vendor or advertiser. For the purposes of this Agreement, "vendor" and "advertiser" shall include all persons, entities, or organizations with whom the Company is under contract with, has contracted with, or attempted to contract with through new or existing business in the twelve (12) months prior to the Separation Date. Employee further agrees that for a period of twelve (12) months following the Separation Date, Employee will not directly or indirectly encourage, solicit, induce, or attempt to encourage, solicit or induce any employee of the Company to terminate his or her employment with the Company or encourage, solicit, induce, or attempt to encourage, solicit or induce any of the Company's employees to accept employment outside the Company that would end or diminish that employee's services to the Company or that would otherwise interfere with the Company's employment relationship with any employee. Employee acknowledges and agrees the restrictions, prohibitions, and other provisions in this Section 13 are reasonable, fair, and equitable in scope, terms, and duration, and are a material inducement to the Company to enter into this Agreement and provide the payments hereunder to Employee. Employee further acknowledges and agrees the obligations in this Section 13 are necessary to protect the Company's legitimate business interests, and the Company's investment in its employees and the Company's business goodwill considering the nature and extent of the business conducted by the Company.

14. <u>Remedies</u>. Upon breach of Section 6, 10, and/or 13 of this Agreement by Employee, the Company shall have the right to pursue any and all judicial relief, including an award of attorney's fees, in addition to all other available relief. The parties agree that judicial

relief shall include the right of the Company to seek injunctive relief without the need for posting a bond.

15. Section 409A. It is the parties' intent that all "Transition Pay" here under is being paid on account of Employee's "involuntary termination" within the meaning set forth under Section 409A of the Internal Revenue Code of 1986, as amended, (the "Code") and Treas. Reg. section 1.409-1(b)(9) such that no Transition Pay hereunder is intended to be "deferred compensation" within the meaning of Code Section 409A. Notwithstanding the foregoing, the Company makes no representations regarding the tax implications of the compensation and benefits to be paid to Employee under this Agreement, including, without limitation, under Code Section 409A.

16. Non-Admission. The parties understand and agree this Agreement does not constitute any admission of liability, responsibility, wrongdoing, or fault on the part of the Company or Employee and that it is being entered into in good faith to provide Employee with transition assistance as provided herein.

17. Consideration Period and Advice of Counsel.

(a) Employee is encouraged and advised to consult with an attorney prior to signing this Agreement.

(b) Employee has twenty-one (21) calendar days from the date Employee first receives this Agreement (the "Consideration Period") to consider this Agreement, sign it, and return it the Company through Chip Staton, Chief Financial Officer. If Employee does not sign this Agreement and return it within the Consideration Period, it shall be null and void and Employee will not receive the Consideration described in Section 3 above. Employee understands, however, that Employee may elect to sign and return this Agreement prior to the expiration of the Consideration Period. Employee and the Company agree that any modifications to this Agreement, material or otherwise, do not restart or affect in any manner the length or start of the Consideration Period.

(c) Employee has seven (7) calendar days from the date Employee signs this Agreement to revoke acceptance of the terms of this Agreement. In order to revoke the Agreement, employee must send an email to Chip Staton expressing intent to revoke the Agreement. This Agreement will not become effective until the revocation period has expired.

(d) This Agreement does not waive rights or claims that may arise after the date Employee signs it.

(e) The terms of this Agreement not only are understandable, but are fully

5

understood by Employee; and

(f) The consideration recited in this Agreement, is adequate to make it final and binding, and is in addition to payments and benefits to which Employee would otherwise be entitled to as an employee or former employee of the Company.

18. Choice of Law, Jurisdiction, and Severability. This Agreement shall at all times and in all respects be governed by and construed in accordance with the laws of the State of Kansas. The parties agree that any dispute involving the terms of this Agreement will be brought in the appropriate Federal or State Court in Douglas County, Kansas and the parties specifically consent to jurisdiction before such courts for an action arising our of or relating to this Agreement. If any part of this Agreement is found to be invalid, the remaining parts of this Agreement will remain in effect as if no invalid part existed. If any provision of the Agreement is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

19. Assignability. This Agreement shall be assigned by the Company to any person or entity, and shall inure to the benefit of and be binding upon the assignee or other legal successor to the interest of the Company. Employee shall not be entitled to assign his obligations under this Agreement.

20. Entire Agreement. This Agreement contains the entire agreement between Employee and the Company with regard to the subject matter herein.

21. Modifications. This Agreement may be modified only by an agreement in writing signed by both Parties.

22. Waiver. The Company's failure to enforce any provision of this Agreement shall not be deemed or construed to be a waiver of its right to enforce such provision or any other provision of this Agreement.

**EMPLOYEE HAS ELECTED FREELY AND VOLUNTARILY TO EXECUTE THIS TRANSITION AGREEMENT, TO FULFILL THE PROMISES SET FORTH IN THIS TRANSITION AGREEMENT, AND TO RECEIVE THEREBY THE CONSIDERATION DESCRIBED IN SECTION 3 ABOVE. EMPLOYEE UNDERSTANDS THAT, BY SIGNING THIS TRANSITION AGREEMENT, EMPLOYEE IS AGREEING TO WAIVE THE RELEASED CLAIMS HEREIN THAT EMPLOYEE HAS OR MIGHT HAVE AGAINST THE COMPANY.**

Employee and the Company have knowingly and voluntarily executed this Transition Agreement and General Release on the dates indicated below

**SIGNATURES ON FOLLOWING PAGE**

6

Mike Peck

_[signature]_

Date: 3-25-2022

Endpoints News

By: _[signature]_
Its: CEO
Date: 3-29-2022